IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

AHMED MAHMOUD,

                                    Plaintiff,

    v.                                                                    OPINION and ORDER

BOARD OF REGENTS OF THE UNIVERSITY OF                          24-cv-384-jdp
WISCONSIN SYSTEM and
DENEEN WELLIK, in her individual and
official capacities,

                                    Defendants.

---

Plaintiff Ahmed Mahmoud was an assistant professor in the Cellular and Regenerative Biology Department at the School of Medicine and Public Health of the University of Wisconsin—Madison. In fall 2023, the department's executive committee, chaired by defendant Deneen Wellik, voted to deny Mahmood tenure and terminate his employment with the university. Mahmoud successfully appealed the decision and was granted tenure a year later. He resigned the next day and took a position with another university.

Mahmoud contends that he was denied tenure because he is Egyptian, Arab, and Muslim. He brings a claim of unlawful discrimination under Title VII of the Civil Rights Act against the Board of Regents of the University of Wisconsin System, and claims under 42 U.S.C. §§ 1981 and 1983 and the Equal Protection Clause against Wellik. Mahmoud also contends that defendants forced him to resign before his termination date, resulting in his constructive discharge.

Defendants move for summary judgment. Dkt. 46. Mahmoud doesn't have smoking gun evidence of discrimination on the basis of his race, religion, or national origin. But he has adduced evidence of several substantial irregularities in the initial evaluation of his tenure, and

that another comparable tenure candidate was treated more favorably. On the basis of this evidence, a reasonable jury could find that defendants discriminated against Mahmoud when they voted to deny him tenure. The court will deny defendants' summary judgment motion on his discrimination claim. But Mahmoud has not adduced evidence that would support a reasonable jury finding on the constructive discharge claim. The court will dismiss that claim.

PRELIMINARY MOTIONS

Seven motions have been filed with this court that affect the scope of the materials that court will consider in deciding defendants' summary judgment motion. The court begins with those.

First, Mahmoud's motion for leave to amend his complaint is granted. Dkt. 28. As a general rule, courts should freely give leave to amend when justice so requires. Fed. R. Civ. P. 15(a)(2). But a "district court[] may deny leave to amend where there is a good reason to do so, such as futility, undue delay, prejudice, or bad faith." *White v. Woods*, 48 F.4th 853, 860 (7th Cir. 2022) (citation modified). Here, Mahmoud's amended complaint seeks to dismiss his claim for breach of contract, adds a claim for constructive discharge, and includes requests for injunctive relief.

Defendants do not object to Mahmoud removing his breach of contract claim. But they oppose adding a claim for constructive discharge and the requests for injunctive relief, contending they are both futile and prejudicial. As for the constructive discharge claim, defendants addressed that claim in their summary judgment motion, so there is no prejudice in allowing amendment. The court need not decide whether the amended complaint states a

claim for constructive discharge because, even if it does, Mahmoud has not adduced evidence sufficient to survive summary judgment on the claim.

As for the request for injunctive relief, Mahmoud probably didn't need to plead it in the first place: "Rule 54(c) provides that the prevailing party receives the relief to which it is entitled, whether or not the pleadings have mentioned that relief." *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018). On the other hand, it is not clear what injunctive would be available to Mahmoud: he's taken a different job and does not allege that he wishes to return to the University of Wisconsin, so most forms of injunctive relief would be moot. But defendants do not contend that injunctive relief is categorically unavailable in this case, and they do not explain why adding a request for injunctive relief would be futile. If Mahmoud prevails in this lawsuit, the court will consider then what injunctive relief, if any, is appropriate.

Second, Mahmoud's motion for leave to file a surreply, Dkt. 103, is granted as unopposed.

Third, Mahmoud's motion to strike the declaration of Dr. Timothy Kamp, the chair of Mahmoud's mentoring committee, as a "sham affidavit," Dkt. 104, is denied as unnecessary. Even if the court considers Kamp's declaration, it does not affect the court's decision on defendants' summary judgment motion. Even with that declaration, the court concludes that there is a genuine issue of material fact precluding summary judgment on Mahmoud's denial-of-tenure claim.

Fourth, defendants' motion for Rule 11 sanctions, included in their response to Mahmoud's motion to strike, Dkt. 105, is denied. Defendants say that Mahmoud's motion to strike misrepresents Kamp's declaration and that his summary judgment response misrepresented facts. But the court cannot consider the Rule 11 motion because it does not

comply with Rule 11(c)(2), which requires such motions "be made separately from any other motion" and prohibits their filing less than "21 days after service" on opposing counsel. *See N. Illinois Telecom, Inc. v. PNC Bank, N.A.*, 850 F.3d 880, 884 (7th Cir. 2017) (Rule 11 motion filed without serving opposing counsel twenty-one days in advance must be denied). Here, defendants' motion was filed with its response to Mahmoud's motion to strike and without prior service on Mahmoud's counsel.

Fifth, Mahmoud's motion for leave to file a first supplemental brief, Dkt. 112, is granted as unopposed.

Sixth, Mahmoud's motion for leave to file a second supplemental brief, Dkt. 127, is denied. Mahmoud's second supplemental brief cites new evidence and arguments regarding another professor who was granted tenure. Mahmoud contends that the evidence supports his claim that defendants denied him tenure because of his race, religion, and national origin. But even without the supplemental evidence, the court concludes that defendants are not entitled to summary judgment on the denial-of-tenure claim, so it is not necessary to consider the new evidence.

Seventh, defendants' motion to file a corrected response, Dkt. 142, to is denied. The corrected response relates to Mahmoud's motion to file a second supplemental brief. The court is not considering the supplemental brief, so defendants' corrected response is also unnecessary.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

## A.  The parties

Plaintiff Ahmed Mahmoud, is Egyptian, Arab, and Muslim. He started as a tenure-track assistant professor in the Cellular and Regenerative Biology Department in 2017. His core research is in developmental, stem cell, and regenerative biology using mice models.

Defendant Deneen Wellik became the department chair in December 2018. Wellik presided over five or six tenure decisions as the department chair before considering Mahmoud's tenure application. Defendant Board of Regents of the University of Wisconsin System is the administrative body responsible for the management of all UW System schools, including the University of Wisconsin—Madison.

## B.  Tenure process in the Cellular and Regenerative Biology Department

Assistant professors in the department are placed on a seven-year probationary period, and they must obtain tenure by the end of year six unless they receive an extension. Throughout this time, candidates for tenure are guided by a "mentoring committee." The primary responsibilities of the mentoring committee are to be readily accessible to the junior faculty member to respond to questions regarding professional development, such as grant funding, publications, and methods for gaining national recognition, and to provide feedback regarding the junior faculty member's progress. Generally, if the candidate receives tenure, he or she is also promoted to the rank of associate professor.

As the tenure and promotion deadline approaches, assistant professors are tasked with compiling their tenure dossier, which is comprised of three components: their CV; narrative statements detailing their research, teaching, and service; and opinions about the candidate's work in research and teaching from senior faculty members at other institutions with overlapping expertise. The parties refer to these opinions as "arm's-length letters." The decision

to solicit arm's-length letters is subject to a vote by the executive committee, which is the department's governing body responsible for making tenure recommendations and is comprised of all tenured faculty in the department.

After the arm's-length letters are received, the executive committee reviews the completed dossier and makes a tenure recommendation. If the committee votes in favor of the candidate, his dossier is subsequently reviewed by the Dean of the Medical School and the Biological Services Divisional Committee, then by the Provost and Vice Chancellor for Academic Affairs, and finally by the UW-System Board of Regents. If the committee votes against the candidate, his dossier is not advanced, but the candidate may ask for reconsideration by the department. If reconsideration is unsuccessful, the candidate may appeal to the Committee on Faculty Rights and Responsibilities.

## C. Mahmoud's tenure application

### 1. Mentoring committee reviews

Timothy Kamp was the chair of Mahmoud's mentoring committee. He drafted an annual letter updating the department on his tenure progress. In Kamp's letters, Mahmoud consistently received positive feedback. In the early stages of his probationary period, committee members were impressed with the growth of Mahmoud's lab, recruitment of promising trainees, and progress in establishing a plan for teaching. But as Mahmoud approached his tenure deadline, the mentoring committee was concerned with Mahmoud's lab's grant funding and that the lab had only produced two peer-reviewed publications. Despite these concerns, the mentoring committee still remarked that Mahmoud had a strong research program with adequate research in progress to address both concerns. In the final letter, Kemp and the mentoring committee urged Mahmoud to finish at least two or three of his four

publications that were currently in their "final stage," praised his successful mentoring, reviews for teaching, and noted that he had contributed meaningfully to "service," which consists of activities that support the university, the profession, and the wider community.

### 2. Preparing Mahmoud's materials

To prepare for the vote to solicit arm's-length letters, Mahmoud requested feedback on his CV and narrative statements, sending drafts to Wellik and Kamp. Wellik responded first, explaining how Mahmoud should represent his lab's responsibility for concept development and design, data acquisition, analysis, and writing for his publications. After making these changes and adding updates for a newly accepted paper, Mahmoud sent new drafts to Wellik and Kamp. Wellik did not provide further feedback.

Kamp reviewed the updated draft, recommending that Mahmoud do the following: give credit to collaborators if they helped with experiments and writing; delete references to himself as the "senior" author when a more senior member of the department contributed; and delete the statement that he was a "mentor to the other authors." Dkt. 93-4, at 2–5. After incorporating this feedback, Mahmoud sent drafts to Wellik and Kamp one more time. Kamp provided some suggestions for Mahmoud's research statement but remarked that the other materials looked good. Soon after, the completed materials were sent to Wellik and posted for faculty review in advance of the September vote.

### 3. The September meeting

The final step in completing Mahmoud's dossier was for the executive committee to approve soliciting arm's-length letters at their vote on September 6, 2023. There were 15 (out of 16) members of the executive committee present for the September meeting. Jeffery

7

Dilworth was not present for the meeting; however, Wellik allowed him to vote in advance by email.

The executive committee went into closed session to vote on whether to advance professor Junsu Kang's completed tenure dossier and whether to solicit letters for Mahmoud's dossier. Kang's vote was first and, by a show of hands, the executive committee unanimously voted to advance his tenure dossier to the divisional committee. Next, the discussion turned to Mahmoud. After a "very lengthy and highly participatory" discussion, the executive committee used paper ballots and voted against requesting arm's-length letters for Mahmoud, by a count of 7 yes, 8 no, and 1 abstention. Dkt. 72-1, at 120. This was the first time the executive committee had ever voted against seeking arm's-length letters for a tenure candidate.

Five days later, Wellik emailed Mahmoud informing him of the results and the next steps, including a "procedural vote" to officially non-renew his appointment with the university. The email informed Mahmoud that he could request the reasons for the decision and that he could request a reconsideration. *Id.* On October 4, the executive committee voted not to renew Mahmoud's appointment. That day, Mahmoud was informed that his appointment at the university would end in June 2025. Mahmoud promptly requested the reasons for the decision.

### 4. Written reasons for non-renewal

On October 25, 2023, the executive committee provided Mahmoud with a copy of the reasons for the non-renewal of his probationary appointment. This letter was primarily drafted by Wellik and summarizes the executive committee's discussion during the September meeting, broken down into the three "pillars" of academic performance: research, teaching/mentoring, and service. Dkt. 51-3.

As for research, the letter acknowledged that sophisticated mouse modeling experiments, like those used by Mahmoud, take significant time to establish. However, the committee was concerned about the following: (1) Mahmoud's main project had progressed slowly toward R01 funding, the most common research grant awarded by the National Institutes of Health; (2) there had only been four senior-author publications from his lab on three different research topics; (3) two publications came "in the 'eleventh hour' push at the tenure deadline" involving collaboration with senior colleagues; and (4) his pace of productivity.

As for teaching, the letter noted that Mahmoud was the co-director of a new course and provided lectures in several other classes, describing the amount of teaching as "standard for the department." However, the letter also expressed concerns regarding low apparent effort in preparing and updating teaching materials. As for mentoring, the committee praised Mahmoud for the success of one post-doc student that had gone on to a tenure track position at another university but expressed a concern that Mahmoud was not readily available to his mentees.

As for service, the letter notes that Mahmoud served on several department and university committees and as a reviewer for journals and grants. However, the committee considered this amount of service to be "below the average." The letter also notes that service is not a "major pillar of the tenure decision."

### 5. Preparing for reconsideration

After receiving the reasons letter, Mahmoud requested reconsideration of his non-renewal and began taking steps to address the executive committee's stated reasons. This included updating his CV to reflect the following: his fifth paper as the sole corresponding author had been accepted for publication; the status of his first patent application had changed

from under consideration to issued; his work had been named a finalist for the WARF Innovation Award; and professor Ying Ge, a member of the executive committee, was properly listed a co-mentor for a shared PhD student. Additionally, Mahmoud met with his mentoring committee again, allowing them to prepare a new letter that strongly supported his tenure process moving forward and sought to address concerns raised in the reasons letter.

During this time, some executive committee members also discussed Mahmoud's case. Some discussed their view that the September vote had not been fair for Mahmoud, believing Wellik withheld important context regarding Mahmoud's accomplishments and that is was not clear in advance of the meeting that the substance of Mahmoud's tenure candidacy would be discussed. Other professors raised new concerns with Mahmoud. In particular, Ge stated that Mahmoud was making overstatements on his CV related to shared publications. Wellik encouraged Ge to present this information during the reconsideration.

Nobody told Mahmoud about concerns that he was overstating his CV. Indeed, after speaking with Kamp, Ge explicitly asked him not to discuss this feedback with Mahmoud, citing a "concern[] that he will be very angry with [her]" and "worr[ies] about [her] safety, and possibly [Wellik's], given the recent incident at UNC."[1] Dkt. 87-42. Ge also connected Mahmoud's tenure case to the recent shooting at UNC in a conversation with Wellik.

### 6. The November meeting

The reconsideration meeting was held on November 29, 2023. Every member of the executive committee attended the meeting except for Pamela Kreeger. However, she prepared

---

[1] In August 2023, a Chinese associate professor at the University of North Carolina was shot and killed by a Chinese graduate student in the chemistry department.

a statement that was read during the meeting indicating that she would have voted yes instead of no based on what she learned since the September meeting.

After a discussion on the reconsideration process, Mahmoud gave a presentation addressing the reasons letter and answered a few follow-up questions. Afterward, the meeting moved into closed session, during which Ge presented her concerns about overstatements in Mahmoud's CV, which were discussed at length. During the discussion, the committee members questioned whether arm's-length letters could address their concerns that Mahmoud was not in his office enough and may be inflating his CV.

After the discussion concluded, the executive committee voted on paper ballots against soliciting arm's-length letters with 6 yes, 8 no, and 1 abstention.

**D. Mahmoud's appeal to the Committee on Faculty Rights and Responsibilities**

Mahmoud appealed to the Committee on Faculty Rights and Responsibilities. Based on its review of the materials and procedure used to evaluate Mahmoud's tenure, the faculty committee found that Mahmoud's non-renewal was based to a significant degree on unfounded, arbitrary, or irrelevant assumptions of fact and a procedural error. The committee specifically noted that it was an error for the executive committee to treat the September vote as a "decision on the merits of promoting Dr. Mahmoud rather than a more procedural vote to obtain outside letters." *Id.* at 2. Based on these findings, the faculty committee unanimously voted that Mahmoud had been materially prejudiced and advised that an ad hoc de novo committee evaluate Mahmoud's record to determine whether to recommend that tenure be granted.

The ad hoc committee voted on Mahmoud's tenure on September 5, 2024. His dossier included arm's-length letters, updated narrative statements, and an updated CV. The ad hoc

11

committee also reviewed a negative performance letter, drafted by Wellik, and a rebuttal drafted by Mahmoud. After reviewing these materials, the ad hoc committee voted unanimously in favor of advancing Mahmoud's tenure proceedings, advancing only his dossier to the divisional committee, not including Wellik's performance letter or Mahmoud's rebuttal.

The divisional committee met on November 1, 2024, and reviewed Mahmoud's dossier and Wellik's performance letter. After reviewing these materials, the divisional committee voted to defer making a decision and requested supplemental information from the ad hoc committee. After receiving responsive materials (including Mahmoud's written rebuttal, a statement from Wellik and Mahmoud's mentoring committee, and information from interviews with Mahmoud's previous mentees) the divisional committee voted 8–0 to recommend granting tenure.

On February 5, 2025, Mahmoud was promoted to Associate Professor with tenure. On February 6, 2025, Mahmoud resigned.

Additional facts will be introduced where relevant to the analysis.

ANALYSIS

Mahmoud brings claims under Title VII against the Board and under 42 U.S.C. §§ 1981 and 1983 and under the Equal Protection Clause against Wellik, contending that defendants denied him tenure based on his race, religion, and national origin and forcing him to resign early by creating a hostile work environment.

Defendants move for summary judgment on all of Mahmoud's claims, on three grounds. First, defendants contend that Mahmoud's individual capacity claims against Wellik are barred by sovereign immunity and for lack of personal involvement. Second, defendants contend that

12

no reasonable jury could find that any decisionmaker discriminated against him because of his race, religion, or national origin. Third, defendants contend that no reasonable jury find that Mahmoud was constructively discharged.

The court will grant summary judgment if the material facts are undisputed and defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court will view the summary judgment evidence in the light most favorable to plaintiff and draw all reasonable inferences in his favor. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 908 (7th Cir. 2022). But it is Mahmoud's burden to adduce evidence sufficient to support a reasonable jury a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## A. Sovereign immunity and the claims against Wellik

Sovereign immunity is a privilege of the sovereign not to be sued without its consent recognized by the Eleventh Amendment and it generally prohibits private parties from suing states in federal court without their consent. *See Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 520 (7th Cir. 2021); *Gerlach v. Rokita*, 95 F.4th 493, 498 (7th Cir. 2024). But Congress has the power to abrogate sovereign immunity, which Congress did in enacting Title VII. *Nanda v. Bd. of Trs. of Univ. of Illinois*, 303 F.3d 817, 831 (7th Cir. 2002). Defendants do not contend that sovereign immunity applies to Mahmoud's Title VII claims against the Board. But defendants seek to dismiss Mahmoud's claims against Wellik in her individual capacity as barred by sovereign immunity.

Mahmoud asserts the same two claims against Wellik as he does against the Board: (1) Wellik discriminated against him in the tenure decision; and (2) Wellik constructively discharged him. Mahmoud seeks damages against Wellik in her individual capacity and injunctive relief against Wellik in her official capacity. Defendants do not challenge

13

Mahmoud's official capacity claims on sovereign immunity grounds, so the court need not address that issue.

Typically, state officials may be sued in their individual capacities without raising sovereign immunity concerns. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991). However, sovereign immunity may still bar these claims if they "demonstrably [have] the identical effect as [claims] against the state." *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001).

This court has recently discussed how sovereign immunity applies to cases in which a state employee has sued a supervisor for conduct at the workplace under § 1981 and § 1983. *See Hoffman v. Board of Regents of University of Wisconsin System*, No. 23-cv-853-jdp, 2025 WL 1504376 (W.D. Wis. May 27, 2025), and *Melgaard v. Wisconsin Dep't of Nat. Res.*, No. 24-CV-561-jdp, 2025 WL 3268370 (W.D. Wis. Nov. 24, 2025). In those cases, this court construed *Omoseghon v. Wells*, 335 F.3d 668 (7th Cir. 2003), and *Haynes v. Indiana University*, 902 F.3d 724 (7th Cir. 2018), to stand for the following principle: "sovereign immunity bars a state-employed plaintiff from bringing individual-capacity claims against state-employed supervisors or coworkers who deprived him of rights, benefits, or opportunities arising from his employment relationship with the state." *Melgaard*, 2025 WL 3268370 at *4.

The court concludes that the denial-of-tenure claim is barred by sovereign immunity, but the constructive discharge claim is not. The denial-of-tenure claim is foreclosed by *Haynes*, 902 F.3d at 732, because Mahmoud is seeking only the benefit of his employment relationship with the state. But the constructive discharge claim is different. Mahmoud alleges that Wellik created an environment in which Mahmoud was made to feel unwelcome. In other words, Mahmoud alleges that Wellik personally mistreated him, not that Wellik denied him the benefits of state employment.

14

**B. Denial-of-tenure claim**

Under Title VII, it is "unlawful . . . for an employer . . . to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Mahmoud is alleging discrimination based on race, national origin, and religion, which are all protected characteristics under Title VII. The parties agree that a denial of tenure relates to Mahmoud's terms and conditions of employment.

The only dispute is causation: whether the Board denied Mahmoud tenure "because of" his race, religion, or national origin. Mahmoud says he was. The Board says that it was a combination of two other reasons: (1) Mahmoud overstated his credentials in his CV; and (2) Mahmoud was too often absent from the department, which had a negative effect on his productivity.[2]

Mahmoud contends that he can prove causation in two ways: (1) under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973); and (2) with evidence Wellik used the executive committee as a dupe to trigger a discriminatory employment action, often called the "cat's paw" theory in the case law. But the court is not constrained by a particular evidentiary framework. As the court of appeals has explained, the sole question the court must consider is whether the plaintiff has adduced sufficient evidence to allow a reasonable jury to infer intentional discrimination because of a protected

---

[2] Defendants didn't discuss these reasons in their opening brief, raising the question whether they forfeited any reliance on those issues for the purpose of their summary judgment motion. But the court is granting Mahmoud's motion to file a sur-reply in part to respond to those reasons, so Mahmoud is not unfairly prejudiced. In any event, the outcome of the summary judgment motion would be the same with or without consideration of those reasons.

characteristic. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citation omitted). The court concludes that Mahmoud has adduced three types of evidence that, considered together, satisfy that standard: (1) defendants departed from their usual practice in considering Mahmoud's tenure application; (2) defendants' stated reasons for denying tenure are pretexts; and (3) defendants granted tenure to a similarly situated candidate.[3]

### 1. Departure from usual practice

The process for reviewing Mahmoud's tenure application departed from the executive committee's usual practice in three ways. First, the committee chose not to solicit letters from outside academics in Mahmoud's field before deciding whether to grant tenure. It is undisputed that the committee generally placed significant weight on arm's-length letters when considering tenure applications. Dkt. 104-1, Kamp Dep., at 26:14-20. It is also undisputed that the committee had always solicited such letters in the past, without considering the merits of the tenure application. Indeed, the department's guidelines regarding tenure do not call for a meeting to vote on promotion until letters are received. Dkt. 89-1, at 13. Defendants identify no other instance in which they declined to solicit letters before voting on tenure.

Defendants identify no reason for departing from their usual practice. Instead, they say that the executive committee always conducted a separate vote on soliciting letters before

---

[3] Mahmoud also presented evidence of comments made by two executive committee members which may have supported an inference that they hold a discriminatory bias toward individuals who are Egyptian, Arab, or Muslim. These are arguably immaterial "stray comments." *See Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 934 (7th Cir. 2020) But because Mahmoud's other evidence is sufficient to create a genuine dispute of material fact as to his denial of tenure, the court need not consider the statements for the purpose of defendants' summary judgment motion.

voting on tenure. But that argument misses the point. Regardless of whether it was common to hold a vote, defendants admit that they had voted to solicit letters for every other candidate in the past, and they have adduced no evidence that previous votes were contingent on an assessment of the candidate's qualifications. Rather, the faculty committee found that the vote to solicit letters was a routine, procedural step and a mere formality. A reasonable jury could make the same finding.

Second, the executive committee generally voted on tenure by a show of hands. But in Mahmoud's case, the committee voted in secret, using paper ballots. Again, the committee had never done this before, and defendants provide no coherent reason for why they made the change for Mahmoud. Wellik said that they conducted a secret ballot "to ensure each [committee] member could vote free of pressure from others." Dkt. 61-36, at 2. But this does not explain why Wellik was concerned about "pressure" in Mahmoud's case but no one else's. One reasonable inference is that Wellik opposed Mahmoud's tenure and believed that committee members would feel freer to vote "no" on a secret ballot than if they had to publicly identify their opposition.

Third, Wellik imposed stricter attendance rules on Mahmoud's reconsideration vote. Specifically, Kreeger wanted to participate in the reconsideration vote by video conference or to vote absentee. Wellik knew at the time that Kreeger supported granting tenure to Mahmoud. Dkt. 38-1. However, instead of allowing Kreeger to vote absentee, as she allowed Dilworth to do during the September vote, she denied Kreeger's requests, without explaining the difference between these meetings. One reasonable inference is that Wellik wanted to exclude one of Mahmoud's supporters from the vote.

"An employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination." *See Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017). As discussed, there are three ways that the executive committee handled Mahmoud's tenure application differently from previous candidates, and each of the deviations potentially prejudiced Mahmoud's candidacy. A reasonable jury could infer that the committee treated Mahmoud differently because of his race, national origin, or religion.

### 2. Pretext

A reasonable jury may infer discriminatory intent from evidence that the employer's stated reasons for an adverse employment action are pretextual: "Where . . . there is a question of fact as to the believability of an employer's purported reasons for an employment decision . . . it suffices to defeat the employer's summary judgment motion." *Greengrass v. Int'l Monetary Sys. Ltd.,* 776 F.3d 481, 487 (7th Cir. 2015) (internal quotations and alterations omitted). In this case, Mahmoud has adduced evidence that the Board's asserted reasons for denying him tenure are pretextual.

### a. Overstatement of credentials

Defendants say that the denial of tenure was justified in part by concerns that Mahmoud overstated his credentials in his CV. But the Board never told Mahmoud about this reason: it was not included in the reasons letter provided by the Board and no committee member otherwise brought it up to Mahmoud. "When evidence indicates an attempt to justify a discharge after the fact, it can suggest a discriminatory motive." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 882 (7th Cir. 2016).

Defendants say that they gave Mahmoud notice of this concern when Kamp and Wellik told him that he should correctly credit collaborators in his CV. But Kamp testified in his

deposition that his concerns regarding attribution were addressed *before* the September vote against seeking arm's-length letters. Dkt. 104-1, Kamp Dep., at 117:19-23. That testimony is enough to create a factual dispute about whether Mahmoud was denied tenure because of lingering concerns about his CV.

### b.  Lack of presence in the department and poor mentoring

Defendants contend that Mahmoud was excessively absent from the department, which had a negative effect on his ability to mentor students.

The reasons letter identified a lack of service as a concern, but a reasonable jury could find that absences from the department did not actually motivate the executive committee's decision. The letter itself stated that department engagement was not "a major pillar of the tenure decision." Dkt. 51-3, at 2. Defendants identify only two committee members who expressed a concern about this issue, Wellik and Dilworth. But Wellik also stated that Mahmoud's teaching and research were strong enough that "perhaps [his low service] does not matter at all." *See* Dkt. 70-14, at 2–3. And Dilworth voted in *favor* of Mahmoud's tenure, so Dilworth's personal concerns were unlikely to have influenced the decision. A reasonable jury could infer that Mahmoud's alleged absences from the department did not play a part in the denial-of-tenure based on the absence of any evidence in the letter or statements from committee members that the issue was important to them.

Regarding mentorship, defendants say that one of Mahmoud's graduate students complained about her time working in Mahmoud's lab, arguing that it is reasonable to infer that this frustration stemmed from working in a lab without guidance from Mahmoud. But it is undisputed that, under Mahmoud's mentorship, this student went on to complete her PhD and went on to start a post-doctorate position at another university, something the executive

committee considers positive. Dkt. 33, Wellik Dep., at 58:5–24. Additionally, it is undisputed that other graduate trainees found that they were able to thrive under plaintiff's mentorship. Dkt. 96-1, at 10–14. Defendants do not explain why the complaint of one student who was ultimately successful would be a significant factor in a professor's tenure candidacy. A reasonable jury could find the purported problems with Mahmoud's mentoring were pretextual.

### 3.  More favorable treatment of similarly situated tenure candidates

If an employer gives more favorable treatment to similarly situated employees who are not members of the plaintiff's protected class, that is compelling evidence of discrimination. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 708–09 (7th Cir. 2013). After all, "[t]he critical issue [in a discrimination case] is whether members of one [protected group] are exposed to disadvantageous terms or conditions of employment to which members of [an]other [group] are not exposed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). So if a plaintiff can show that other employees without relevant differences received better treatment than he did, that is enough to support a finding that the employer treated him less favorably because of the protected characteristic. *See Prochaska v. Menard, Inc.*, 829 F. Supp. 2d 710, 720 (W.D. Wis. 2011).

The parties dispute whether Mahmoud is similarly situated to Junsu Kang and Barak Blum, two professors who received tenure in UW's Cellular and Regenerative Biology Department while Wellik served as chair. Neither Kang nor Blum is Egyptian, Arabic, or Muslim. Because the executive committee members that considered Kang and Mahmoud's tenure applications were identical and "the similarly situated analysis does not require numerosity, the plaintiff need offer evidence as to only one similarly situated comparator," *Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011), the court will focus on Kang.

20

Employees are similarly situated if they are the same in all relevant respects; which respects are relevant depend on the facts of the case. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). The key question is whether there are "confounding variables" that make it unreasonable to infer that the two employees should have been treated the same way. *Id.*

Defendants do not dispute that Kang and Mahmoud are similar in many respects. The key dispute is whether Kang and Mahmoud had similar qualifications.

The parties dispute three threshold issues regarding Kang and Mahmoud's relative qualifications. First, defendants contend that Mahmoud cannot rely on more favorable treatment that Kang received unless Mahmoud was clearly more qualified than Kang. Dkt. 101, at 37–38. Defendants cite a district court case, *Xi v. Trs. of Purdue Unviersity*, No. 4:23-CV-88-PPS, 2025 WL 2603926 (N.D. Ind. Sept. 8, 2025) that followed *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir. 2002), which held that "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Id.* at 1179 (internal quotations omitted). Defendants' reliance on the principle in *Millbrook* is misplaced. In *Millbrook*, the plaintiff was a black employee contending that he should have received a promotion that instead went to a white employee. In a situation in which there is only one position, it makes sense that the plaintiff would have to present evidence that he was clearly more qualified than his competitor to raise an inference of discriminatory intent (in the absence of other evidence). But defendants do not contend that Kang and Mahmoud were competing for the same position. Rather, both of them could have obtained tenure if they were both

deemed to be qualified. So the question is simply whether Kang and Mahmoud were similarly situated, not whether Mahmoud was clearly more qualified than Kang.

Second, Mahmoud contends that the court should consider all of his accomplishments through his successful administrative appeal. But defendants could not have considered qualifications that Mahmoud had not yet acquired at the time of their decision, so those qualifications are not relevant to proving discrimination. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014). So, in comparing Mahmoud and Kang's relative qualifications, the court will only consider qualifications each candidate had at the time of their tenure decisions.

Third, Mahmoud relies on the export report of Laurie Boyer, a tenured professor in the Biology department at the Massachusetts Institute of Technology, to show that he was at least as qualified as Kang. Dkt. 80. It is not clear whether an expert report is needed or helpful in this context. Regardless, the expert relied on the qualifications Mahmoud had at the time of his successful administrative appeal rather than at the time of the tenure decision, so the court did not consider the report.

A reasonable jury could find that Mahmoud and Kang were similarly qualified in research and teaching, which, according to defendants, are the primary considerations for a tenure decision. Dkt. 33, Wellik Dep., at 33:6-10. As for research productivity, the university focuses on the number and quality of publications, along with the level of the tenure candidate's contribution to the publication, and the funding backing the applicant's research. Kang had three sole corresponding and one co-corresponding author publications; Mahmoud had four sole corresponding publications at the time of the September vote and five at the time

of his reconsideration.[4] One of Mahmoud's publications was in *Circulation*, a leading peer-reviewed journal in cardiovascular research. And, the university filed two patent applications in conjunction with two different lines of Mahmoud's research, a feat Kamp described as "exceptional." Dkt. 104-1, Kamp Dep., at 34:13–23. None of Kang's publications from his probationary period were published in as significant of a journal or resulted in a patent application. As for research funding, both Mahmoud and Kang accumulated funding awards of roughly $2.3 million, with Mahmoud having a slight edge.

As for teaching and mentorship, the department mostly cares about time spent lecturing in classes and its quality and mentorship of postdoctoral fellows and graduate students toward independent scientific careers. Dkt. 104-1, Kamp Dep., at 22:2-23:13. Mahmoud had 20 lecture hours and Kang had 25. But Mahmoud had more demonstrated mentorship: two of his mentees had completed a doctorate or post-doctorate and continued their scientific careers at other universities, but Kang had no mentees who completed either program.

Defendants do not dispute that Mahmoud and Kang were similarly situated in the metrics described above. But they say that the two candidates were different in two other relevant respects.

First, defendants contend that Kang had better service contributions, which relate to activities that faculty members undertake to support the institution, their profession, and the wider community, beyond their responsibilities of research and teaching. However, a

---

[4] A tenure candidate is a "corresponding author" if the research for the publication was conducted and led by the candidate's laboratory. He is a "co-corresponding author" if the work was shared equally with another lab. Mahmoud had an additional sole corresponding publication at the time of both votes, but it was absent from his CV, so it is not clear whether the committee was aware of it. Regardless of whether that publication is considered, Mahmoud had at least as many publications as Kang.

reasonable jury could disagree. As an initial matter, Wellik testified that a candidate's service "isn't a formal consideration for moving forward," Dkt. 33 (Wellik Dep. 33:15–16), raising the question whether defendants actually considered any differences between Kang and Mahmoud's service. In any event, defendants do not explain why Kang's service was more impressive than Mahmoud's. Instead, they merely list the service activities identified in his CV. Dkt. 51-7, at 14–16. But both Mahmoud and Kang's CVs include similar types of service, including participating on and chairing committees in the department, in other departments, and for the university; working with university admissions; working as an ad hoc reviewer for scientific journals; and working as grant reviewers. Dkt. 87-26, at 16–17. Accordingly, a reasonable jury could find that Kang and Mahmoud had similar records of service.

Second, defendants contend that Kang had superior funding because he received an R01 grant, the most common research grant from the National Institute for Health, for a second line of research. However, a reasonable jury could find that is not a relevant difference, for three reasons: (1) the executive committee did not identify a lack of funding in the reasons letter as a reason for denying tenure; in fact, the committee described Mahmoud's lab as "well funded," Dkt. 33-32, at 2; (2) Mahmoud's funding supported three independent research topics, Dkt. 52-3, at 1, one more than Kang; and (3) a reasonable jury could infer that that the source of Kang's second line of funding is not a meaningful distinction because guidance from the university to tenure candidates states that "other types of significant research funding [] can be accepted in lieu of the R01." Dkt. 89-15, at 7. And, a member of Mahmoud's ad hoc committee described his department of defense funding as "kind of like an R01 equivalent." *See* Dkt. 64-1, at 2–3. This indicates that a reasonable jury could also conclude that these funding sources are not meaningfully different. Accordingly, drawing all reasonable inferences

in Mahmoud's favor, a jury could find that funding was not a meaningful distinction between Kang and Mahmoud.

### 4. Conclusion

Mahmoud does not have "smoking gun" evidence that defendants discriminated against him because of his race, national origin, or religion. Almost none of the evidence he cites directly relates to any of those characteristics. But that type of evidence is rare. A plaintiff can rely on circumstantial as well as direct evidence of discrimination. In this case, Mahmoud has adduced evidence that defendants approved tenure for a similarly situated candidate, that defendants departed from their usual tenure process in multiple ways that potentially prejudiced Mahmood, and that defendants' stated reasons for denying tenure to Mahmood are pretextual. From this, a reasonable jury could find that defendants discriminated against Mahmoud.

## C. Constructive Discharge

Mahmoud also claims that he was constructively discharged. Under Title VII and § 1983, constructive discharge constitutes an adverse employment action, and the standard is the same under both laws. *Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004); *Levenstein v. Salafsky*, 414 F.3d 767, 774 (7th Cir. 2005). The Seventh Circuit has recognized two forms of constructive discharge: (1) an employer acts in a manner so as to have communicated to a reasonable employee that they will be terminated, and the plaintiff employee resigns and (2) a plaintiff resigns due to discriminatory harassment. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679–80 (7th Cir. 2010). Mahmoud contends that he can prove this claim both ways.

Under the first theory, Mahmoud argues that defendants communicated to him in their October 2023 letter that his appointment with the university would end in June 2025. But at

the time Mahmoud quit, the executive committee's decision had been overturned, and he had been *granted* tenure. So there was no basis at that point for Mahmoud to believe that his termination was imminent.

Under the second form of constructive discharge, plaintiffs must show that the employer made the employee's working conditions so intolerable that a reasonable employee would be forced to resign. *Roby v. CWI, Inc.*, 579 F.3d 779, 785–86 (7th Cir. 2009). The plaintiff must "show a more egregious situation than a hostile work environment because an employee is normally expected to continue working while seeking redress." *Id.*

To support this theory, Mahmoud cites his own testimony that colleagues stopped speaking with him and students did not want to work with him because "[f]aculty within the department, influenced by Wellik, began circulating a narrative that Mahmoud was 'going to be very angry and might hurt them.'" Dkt. 77, at 72 (citing Dkt. 75, ¶¶ 81–82). Mahmoud also says that Wellik tried to sabotage his administrative appeal by submitting a performance letter to the ad hoc review committee that included false information about his teaching practices.

This claim fails for two main reasons. First, Mahmoud cites no foundation of personal knowledge for his belief that Wellik influenced faculty and students to stop speaking or working with him, and he provides no details about the faculty or students who refused to interact with him. The evidence shows that Mahmoud continued working with his students and that other faculty members offered to help him find a different position at the university and to address any prejudice caused by Wellik's performance letter.

Second, the type of conduct that Mahmoud alleges is not severe or pervasive enough to support a hostile work environment claim, let alone a claim for constructive discharge.

Mahmoud has not adduced evidence that he was physically or sexually harassed, that anyone threatened him, that the university ignored complaints of mistreatment, or that he was otherwise prevented from doing his job. *See Chapin*, 621 F.3d at 679–80; *Roby*, 579 F.3d 779, 785–86; *Boumehdi v. Plastag Holdings*, LLC, 489 F.3d 781, 790 (7th Cir. 2007). Being given the cold shoulder and receiving a bad performance review do not amount to working conditions so intolerable that a reasonable employee would feel forced to resign. The court of appeals has rejected constructive discharge claims involving much more serious allegations. *See Levenstein v. Salafsky*, 414 F.3d 767 (7th Cir. 2005) (no constructive discharge for professor who was suspended pending a sexual harassment investigation, temporarily assigned off campus for almost a year, removed as department head, and given demeaning tasks).

## ORDER

IT IS ORDERED that:

1.  Mahmoud's motion for leave to amend his complaint, Dkt. 28, is GRANTED.

2.  Mahmoud's motion to file a surreply, Dkt. 103, is GRANTED.

3.  Mahmoud's motion to strike the declaration of Timothy Kamp, Dkt. 104, is DENIED.

4.  Defendants' motion for sanctions, Dkt. 105, is DENIED.

5.  Mahmoud's motion to file a first supplemental brief, Dkt. 112, is GRANTED.

6.  Mahmoud's motion to file a second supplemental brief, Dkt. 127, is DENIED.

7.  Defendants' motion to file a corrected brief in response to Mahmoud's second supplemental brief, Dkt. 142, is DENIED.

8.  Defendants' motion for summary judgment, Dkt 46, is GRANTED as to Mahmoud's claims against Wellik in her individual capacity and as to his claims for constructive discharge. The motion is DENIED as to his Title VII denial-of-tenure claim.

9.  The claims against defendant Deneen Wellik in her individual capacity and Mahmoud's claim for constructive discharge against Wellik are DISMISSED. Mahmoud may proceed against Wellik in her official capacity on his denial-of-tenure claim.

Entered January 29, 2026.

<div style="margin-left: 40%;">

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

</div>